PLANNED PARENTHOOD ASSOCIA-
TION OF the ATLANTA AREA, INC.,
and Planned Parenthood of East Cen-
tral Georgia, Inc., Plaintiffs,

v.

Joe Frank HARRIS, Governor of the
State of Georgia, Individually and in
His Official Capacity, Defendant.

Civ. A. No. 87–1405A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 8, 1987.

Margie Pitts Hames, Robert L. Gold-stucker, Nall, Miller, Owens, Hocutt & Howard, Elizabeth Joan Appley, Atlanta, Ga., Dara Klassel, Beth Otten, Roger K. Evans, Planned Parenthood Federation of America, New York City, for Planned Parenthood Ass'n of the Atlanta Area.

Margie Pitts Hames, Robert L. Gold-stucker, Atlanta, Ga., for Planned Parenthood of East Cent. Georgia.

Michael J. Bowers, H. Perry Michael, William C. Joy, Kathyn L. Allen, Patricia Downing, State Atty. Gen.'s Office, Atlanta, Ga., for Jose Frank Harris, Governor.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiffs, providers of abortions and abortion-related services filed this class action seeking relief against the recently enacted Georgia Parental Notification Act (the "Act"), which requires unemancipated, unmarried minors to notify one parent of their intention to terminate their pregnancies or to bypass the parental notification requirement and petition the juvenile court for waiver of that requirement. Ga. Off'l Code Ann. §§ 15–11–5 and 15–11–110 *et seq.*

Plaintiffs contend that the Act is an unconstitutional restriction on the right to abortion because it will severely impede their minor patients' access to abortion services. Plaintiffs seek preliminary injunctive relief to stop the function of the Act asserting that the Act is unconstitutional on its face and would be unconstitutionally applied if allowed to be put into practice. Plaintiffs seek declaratory and permanent injunctive relief on the ground that the Act unduly restricts the right to privacy, due process and equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution.[1]

## PROCEDURAL BACKGROUND

The Act was scheduled to go into effect July 1, 1987. Plaintiffs brought this action and moved for a temporary restraining order and a preliminary injunction on June 25, 1987. After a hearing on the matter, this court on June 30, 1987 granted plaintiffs' motion for temporary restraining order on the grounds that the standard for a temporary restraining order had been met and in order to review the rules promulgated by the Georgia Supreme Court on June 29, 1987 to determine whether such rules sufficiently obviated the probable constitutional defects. The court on July 16–17 held a hearing on plaintiffs' motion for a preliminary injunction. The court directed both sides to file post hearing briefs by August 3, 1987 and reply briefs by August 14, 1987. This action then is currently before the court on plaintiffs' motion for preliminary injunction.

## THE ACT

### A. *Notification Requirement*

The Act makes it a misdemeanor for any person to perform an abortion on an unmarried, unemancipated minor without obtaining verification that she has notified one of her parents of her intention to have an abortion. Ga. Off'l Code Ann. §§ 15–

---

**1.** The following *amici curiae* filed briefs in support of plaintiffs' motion: The American Civil Liberties Union of Georgia; The Georgia Women's Political Caucus, The Georgia National Organization for Women, The Georgia Psychologi-cal Association, and The League of Women Voters.

Briefs in opposition were filed by: The Georgia Right to Life Committee, Inc., The Rutherford

11–112 and 118.[2] Verification may be accomplished in one of only two ways: (1) the minor's parent or legal guardian must accompany her to the abortion facility and furnish an affidavit that he or she is the minor's parent or guardian, § 15–11–112(a)(1)(A), or (2) the minor must find another adult to accompany her to the abortion facility and furnish an affidavit to the effect that a parent or legal guardian of the minor has been notified. § 15–11–112(a)(1)(B). The Act also provides that if the minor has no parent or legal guardian, another adult must accompany her to the abortion facility and furnish an affidavit that a person standing *in loco parentis* has been notified. § 15–11–112(a)(1)(C).

### B. *Judicial By-Pass Provision*
#### 1. Standard for Waiver

The Act provides that minors who choose not to notify their parent or guardian, or whose parent or guardian cannot be located, may petition a juvenile court for a waiver of the notice requirement. The Act provides that petition may be made by the minor's next friend. § 15–11–112(b). The notification requirement must be waived if the juvenile court finds either: (1) that the minor is "mature and well-informed enough to make intelligently the abortion decision on her own;" § 15–11–114(c)(1), or (2) that the notice "would not be in the best interests of the minor." § 15–11–114(c)(2).

#### 2. Venue

The Act limits venue for such a petition to the juvenile court in the county in which the minor resides or the county in which the abortion is to be performed. § 15–11–112(b). The minor petitioner or next friend will be notified of the date, time and place of the hearing at the time of filing. § 15–11–113. The parent, [or their surrogate] guardian or person standing *in loco parentis* shall not be notified. § 15–11–113.

Institute of the Georgia Legal Defense Foundation, Inc. and Mitchell Williams.

**2.** The Act is set forth fully in Appendix I to this order.

#### 3. Timetable for Hearing and Appeal

The Act provides only that once the petition is filed that a hearing must be held within three days excluding Saturdays, Sundays and holidays. § 15–11–113. The Act provides no specific time limit for a decision to be rendered on the petition but states that juvenile courts should give the petitions precedence over other pending matters to ensure a decision be reached "as expeditiously as is possible under the circumstances of the case." § 15–11–114(b). The Act provides for "an expedited appeal" but gives no time frame for hearing an appeal or disposition. § 15–11–114(e). The Act authorizes and requests the state appellate courts to make rules to implement expeditious appeal. § 15–11–114(e).

#### 4. Preservation of Anonymity

The Act provides that all court proceedings be conducted in a manner to preserve the anonymity of the parties both in juvenile court and on appeal § 15–11–114(b) and (e). The appeals courts are "authorized and required" to make rules to implement the guarantee of anonymity. § 15–11–114(e).

### THE RULES PROMULGATED BY THE SUPREME COURT AND COURT OF APPEALS

The Act § 15–11–114(e) authorizes and requests the "appellate courts" to promptly issue such rules as are necessary to preserve anonymity and to ensure the expeditious disposition of procedures provided by the Act. The Georgia Supreme Court on June 29, 1987 promulgated Rules 23.1–23.7 amending the Uniform Juvenile Court rules. The Georgia Court of Appeals on July 8, 1987 amended the Rules for the Court of Appeals adding new rule 51 providing for expedited appeals under the Parental Notification Act.[3]

### A. *Rule 23 of the Uniform Juvenile Court Rules*

The Supreme Court amended the Uniform Juvenile Court Rules to specify that

**3.** Both sets of rules are set forth fully as Appendices II and III to this order.

whenever a minor petitions the juvenile court for relief pursuant to the Act, the court shall appoint a guardian *ad litem* to protect the minor's interests. Rule 23.2. The amendment requires that the hearing provided for in Ga. Off'l Code Ann. § 15–11–113 be conducted by a judge in all instances. Rule 23.4. The petitioning minor or next friend must be notified of the date, time and place of the hearing at the time the petition is filed. Rule 23.5. The hearing must be held within three days of the filing of the petition excluding Saturdays, Sundays and holidays. *Id.*

The amendment requires the court to issue a written order stating specific factual findings and legal conclusions supporting its decision. Rule 23.6. Such order is to be styled in the same manner as the petition and shall reflect the minor's social security number and date of birth. *Id.* A certified copy of the order shall be furnished the minor within 24 hours of the conclusion of the hearing. *Id.*

The new rules provide that the name of the minor not appear in any public record including any transcript of the hearing. Rule 23.7. The Clerk is directed to obliterate or render illegible any reference to the minor's name on any public record. *Id.*

### B. *Rule 51, Rules of the Georgia Court of Appeals*

New Rule 51(b) provides an "expedited appeal" when a juvenile court has denied a petitioning minor waiver of the notification requirements under Ga. Off'l Code Ann. § 15–11–114(c). Rule 51(b). A minor seeking an expedited appeal shall file a Notice of Appeal and a certified copy of the order denying waiver of notice with the Clerk of the Court of Appeals within five days of the receipt by the minor of the Juvenile Court's order. Rule 51(c); 51(i). A copy of the Notice of Appeal must also be filed with the Juvenile Court. *Id.* Upon receipt of the Notice of Appeal, the Court of Appeals will issue an order to the Juvenile Court directing that the record be transmitted to and received by the Court of Appeals within five days from the date of the filing

of the Notice of Appeal with the Court of Appeals. *Id.* Any brief or enumeration of errors must be filed within this time period. *Id.*

The rules provide that the record of the Juvenile Court be certified by the Clerk of the Juvenile Court and transmitted to the Court of Appeals under seal. Rule 51(d). The Clerk of the Court of Appeals then assigns the appeal to a panel of the judges of that court who must take the matter under consideration and issue a decision within five days of receipt of the record. Rule 51(e). Any motion for rehearing of an adverse ruling must be decided within five days of the filing of such a motion. Rule 51(f).

All pleadings, briefs, orders, transcripts, exhibits and any other written recorded material that are part of the record shall be considered and treated by the Court of Appeals as confidential. Rule 51(j). Upon conclusion of the appellate proceedings the record will be sealed, and the contents of the record shall not be disclosed, except upon order of the Court of Appeals or the Georgia Supreme Court. *Id.*

### TESTIMONY AT HEARING

At the hearing held July 16–17, 1987 the court heard witnesses testify as to (1) some of the background facts about minors faced with a pregnancy, (2) the impact of the Georgia Parental Notification Act on minors and physicians, (3) the capacity of the Georgia Juvenile Court system to handle the judicial by-pass procedure provided in the Act.[4]

### A. *Delay is Dangerous and Expensive*

Dr. Stanley K. Henshaw, Deputy Director of Research at the Alan Guttmacher Institute, a nonprofit corporation for research, public education and policy analysis on issues related to fertility control, testified as to the distances minors in Georgia travel to obtain abortions. Dr. Henshaw testified (1) that 96–98% of abortions in Georgia are obtained in the four metropolitan areas of Atlanta, Augusta, Columbus and Savannah, July 16, 1987 Hearing, Tran-

---

**4.** Each witness was adequately qualified as an    expert witness for the statements made.

script at 14; (2) that 51% of the minors in Georgia live outside these four rural areas, Tr. at 14; and (3) that about 25% of minors obtaining abortions in Georgia travel 50 miles or more to obtain their abortions. Tr. at 14.[5] Additionally, Dr. Henshaw testified that a study of 14 states, not including Georgia, found that women receiving abortions outside their home county received the abortion on average 4.7 days later than those receiving abortions inside their home counties.

From this evidence plaintiffs argue that the delays they contend will be caused by implementation of the Act, for example in travel for a parent or accompanying adult fulfilling the attendance requirement, will exacerbate delays already endemic to the existing provision of abortion services in Georgia.

Ms. Lynne Randall, Executive Director of the Feminist Women's Health Center in Atlanta, testified that in her experience about 50 percent of minors seeking abortions already involve their parents in the decision. Tr. at 27. She generalized from her experience that the younger the patient, the more likely the parent will be involved. Tr. at 27–30.

When asked why those minors who have not informed their parents fail to do so, Ms. Randall responded from her experience that the fear of retribution, physical abuse, emotional abuse, harassment and fear of disownment or being kicked out of the home contributed to their reluctance. Tr. at 29–30. She testified that in her experience some minors tell their parents, but for a variety of reasons, including the inability to be relieved from job duties, the parents do not accompany their daughter at the

time of the abortion. Tr. at 30. Sometimes minors are accompanied to the Feminist Women's Health Center by a girlfriend or boyfriend. Tr. at 30. Ms. Randall has known of instances where parents were physically unable to attend because of illness or imprisonment.

Ms. Randall testified that the cost to a patient for an abortion rises commensurate with the gestational age of the minor because of the increased level of difficulty and risk of the procedure as time goes on. Tr. at 41–42. Gestational age is measured from the women's last menstrual period. Tr. at 152. She testified that in her facility a first trimester abortion occurring less than twelve weeks into the pregnancy costs between $216–236. At 13–14 weeks the cost is $300. At 15–16 weeks the cost is $400. At 17–18 weeks the cost is $550. And at 19–20 weeks, the cost rises to $750. Plaintiffs introduced a price list from other facilities indicating similar increases in price as the gestational age increases. Plaintiffs' Exhibit 2.

Ms. Randall suggested that minors tend to seek abortions later than adult women. Tr. at 44. This testimony was corroborated by Dr. David A. Grimes, currently an epidemiologist and Professor of Preventive Medicine at the University of Southern California School of Medicine. Tr. at 158. Dr. Grimes testified specifically that teenagers are disproportionately represented among women who request second trimester abortions. Tr. at 159. Additionally, Dr. Grimes testified that the proportion of all abortions performed at 16 weeks gestational age among women ages 14 and younger is three times higher than for women ages

5. Dr. Henshaw based Point One on a crosstabulation provided by the Georgia Department of Human Resources listing each abortion provider in the state and the age of the women who obtained abortions from that provider (92 percent of minors obtaining abortions obtained them in metropolitan facilities not including physicians offices; .5 percent obtained abortions outside the metropolitan areas; and 7.4 percent took place in physicians' offices. Dr. Henshaw allocated 81 percent the 7.4 percent of abortions in physicians offices to metropolitan areas based on data in a Guttmacher survey of abortion providers in Georgia indicates that 81

percent of the physicians offices performing abortions are located in the four metropolitan areas).

Point Two was based on data purchased from Market Statistics, a commercial firm, showing the proportion of minors ages 15–17 who live in the four metropolitan areas.

Point Three was based on a Department of Human Resources table which shows for each provider in the state what counties women came from to obtain an abortion. The distances were calculated from the county seat of the respective counties according to a Rand McNally atlas.

20–24. Both Dr. Grimes and Ms. Randall indicated that factors contributing to this phenomenon include a minor's lack of familiarity with her menstrual cycle, the frequency of an irregular menstrual cycle in teenagers, lack of familiarity with pregnancy symptoms, denial that she is pregnant, fear of telling her parents, lack of knowledge about the differences between a first trimester and second trimester procedure, and lack of information as to where to obtain an abortion. Tr. at 44; 158.

Ms. Randall testified that the results of delay caused by the Act would be more second trimester abortions; Tr. at 44. Additionally she predicted more out-of-state abortions where no parental notification is required causing the minor difficulty in receiving aftercare locally. Tr. at 44–46. She predicted that some minors who reach the 24–26 week stage might not be able to get an abortion at all. Tr. at 44–46. She further predicted that the expense of a later abortion could be prohibitive. *Id.* She indicated that hospitals often charge as much as $800 for any first trimester abortion and that most hospitals do not permit second trimester abortions. Ms. Randall also suggested that fear of complying with either option of the statute might mean more self-induced abortions. Tr. at 46.

Dr. Grimes underscored the dangerousness of delay in evaluating the effect of increasing gestational age on risk to the minor's health. He testified that gestational age is one of the two most important determinants of the likelihood of a complication or death from an abortion.[6] Dr. Grimes summarized the effect of delay stating that the further along the pregnancy, the greater the risk from abortion. Tr. at 152. The types of risks that increase with delay are risk of infection, risk of hemorrhage, risk of perforation or damage to the uterus and risk of amniotic fluid embolism.[7] Tr. at 153.

Dr. Grimes explained that as pregnancy progresses, the mass or bulk of the products of conception increase exponentially as does the size of the uterus. Tr. at 153. To empty a larger uterus, he testified, requires more cervical dilation; in other words stretching the cervix open to a wider diameter. *Id.* Dr. Grimes indicated that this requires a longer operation time and as a result the risk of hemorrhage or infection increase with the increased duration of the operation. Tr. at 153–54.

Dr. Grimes also testified that the risk of death rises directly with gestational age. Abortions at about 11 to 12 weeks entail a risk of death somewhat less than 2 per hundred thousand operations. At about 15 to 16 weeks the risk of death increases to 4.3 per hundred thousand. Beyond that the risk increases to 11.1 death per hundred thousand procedures.[8]

In terms of relative risk between one gestational age and later gestational ages, Dr. Grimes testified based on a study at the Centers for Disease Control of 80,000 abortions between 1975–78 that at about 11 to 12 weeks the risk of a woman suffering a life threatening complication is .3 percent. Tr. at 155. At 13 to 14 weeks the risk doubles to about .6 percent. *Id.* At 15 to 16 weeks the risk redoubles to about 1.3 percent. *Id.* And at 17 to 20 weeks the risk increases to 2 percent, a sixfold increase overall. *Id.*

Dr. Grimes testified that in recent years the abortion mortality rate had slowed due to scientific and technological improve-

---

**6.** Choice of abortion method is the other. Tr. at 167.

**7.** Amniotic fluid embolism is a condition in which the fluid surrounding the embryo or fetus gains access to the mother's circulation.

**8.** Dr. Grimes based his conclusions on data compiled by the Centers for Disease Control entitled, Atrash, MacKay, Biunkin and Hogue, *Legal Abortion Mortality in the United States 1972–1982,* Am.J.Obstet. Gynecol Vol. 156(3); 605–612 March 1987.

Dr. Grimes admitted that the inclusion of the figures from the early 1970's tended to overstate the magnitude of the current risk, but confirmed that the same general trend of increased risk over time still exists. Grimes testified that regardless of technological innovation, an abortion performed at 16 weeks cannot biologically have the same rate of complications as one performed earlier in the pregnancy, as this risk is a function of the enlarging size of the uterus and products of conception. Tr. at 183.

ments and better dispersal of information causing women to seek abortion at an earlier gestational age. Tr. at 185. In his opinion, through dangerous delay and concomitant increase in expense, the Georgia Parental Notification Act would have a deleterious effect on women's health and tend to reverse this tread of reduced mortality.

### B. *The Goal of Encouraging Parental Consultation*

Defendant presented evidence that the statutory goal of promoting parental consultation was worthwhile. Dr. Stephen W. Edmondson, a private practitioner in general psychiatry, testified that parents should be included in the entire pregnancy process. Tr. at 122. Dr. Edmondson indicated that parents may help support the minor before the procedure and ensure proper aftercare when the abortion has been performed. Tr. at 122–125. He also indicated that consultation with parents would add to the discussion of alternatives to abortion and birth control options in the future. *Id.*

Ms. Randall agreed that in many circumstances parental involvement is extremely helpful. Tr. at 46. However, she qualified this statement by saying that in many other situations parental involvement was detrimental. *Id.* Ms. Randall detailed several occasions in which disapproving parents had ostracized and even brutalized their daughter for her decision to have an abortion. Tr. at 46.

### C. *Georgia Juvenile Court Structure*

Mr. Joel C. Perrin, Executive Director of the Council of Juvenile Court Judges of Georgia, testified to the structure of the Georgia Juvenile Justice System and the availability of adjudicators to implement the judicial bypass mechanism. Tr. at 89. Mr. Perrin testified that there are 45 judicial circuits and 159 counties in Georgia. Tr. at 90. The number of counties within each circuit varies in number from one to eight. Tr. at 91. Within each circuit there are superior court judges and juvenile court judges responsible for the juvenile courts of the counties within that circuit. Tr. at 92.

Plaintiffs in questioning Mr. Perrin were interested in the numerical relationship between the number of these judges and the number of counties they serve. Tr. at 93. Relying on data contained in the *Directory of the Georgia Council of Juvenile Judges,* plaintiffs compiled a breakdown to indicate whether a minor woman located in each county in the state would have access to a juvenile or superior court judge on a given day, assuming the judges responsible for the juvenile courts schedule their calendars in such a way to accomplish maximum coverage of counties on that given day. Tr. at 93; Plaintiff's Exhibit 4. The compilation, verified by Perrin, indicates that there are 41 counties in circuits where the judges responsible for juvenile court cover juvenile court for only one county.[9] The compilation indicates there are 13 other counties in circuits where the number of judges assigned to juvenile court exceeds or is equal to the number of counties in that circuit. Tr. at 93–96.[10] The compilation indicates there are 105 counties in circuits where the number of judges assigned to juvenile court is less than the number of counties in that circuit.[11] From this evidence, plaintiffs assert that even assuming the broadest possible coverage, 60 counties would remain uncovered by an appropriate judge on that given day. Mr. Perrin confirmed that the judges are not usually deployed to achieve maximum coverage. Tr. at 96–99. Mr. Perrin further testified that according to the current practice in the juvenile court, if the superior court judge responsible for the juvenile court is not sitting in the county where the minor resides, the minor must travel to the venue where the judge is sitting. Juvenile court

---

9. 42 juvenile court judges and 2 superior court judges cover these 41 counties.

10. 2 juvenile court judges and 17 superior court judges cover these 13 counties.

11. 7 juvenile court judges and 38 superior court judges cover these 105 counties.

judges may travel at the option of the minor. Tr. at 100.[12]

## DISCUSSION

## I. STANDING

Defendant challenges plaintiffs' standing to bring this case under Article III of the United States Constitution, questioning (1) whether plaintiffs have established the requisite "injury in fact" and (2) whether abortion providers alone have standing to assert the rights of their patients. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (two doctors were found to have standing to assert the rights of their patients). Defendant argues that because neither a pregnant minor nor a physician is party to this action, plaintiffs do not have the requisite exposure to an "injury in fact" necessary to confer standing.

■ Plaintiffs respond that the threat of criminal prosecution against them establishes "injury in fact" under the standing requirements of Article III. Courts have consistently granted physicians standing to pursue abortion rights litigation. As the Supreme Court stated in *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973), "the physician is the one against whom these criminal statutes operate in the event he procures an abortion that does not meet the statutory exceptions and conditions." *Id.* at 188, 93 S.Ct. at 745; *see also City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 440 n. 30, 103 S.Ct. 2481, 2498 n. 30, 76 L.Ed.2d 687 (1983) (granting a physician plaintiff who was subject to potential criminal liability for failure to comply with the statutory requirements standing to raise the claim of his minor patients). The Supreme Court has also granted standing to nonphysician providers of family planning services on this basis. *Carey v. Population Services International,* 431 U.S. 678, 683, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675

(1977); *see also Eisenstadt v. Baird,* 405 U.S. 438, 443, 92 S.Ct. 1029, 1033, 31 L.Ed. 2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965).

Plaintiffs argue that plaintiff Planned Parenthood of East Central Georgia is subject, as a corporate entity, to criminal prosecution under Georgia law. The defendant has not responded to this argument. Under Georgia law a corporation may be prosecuted for any crime if a criminal action is "authorized, requested, commanded, performed or recklessly tolerated by the board of directors or a managerial official who is acting within the scope of his employment on behalf of the corporation." Ga. Off'l Code Ann. § 16–2–22(a)(2). The Georgia Parental Notification Act does not confine liability to physicians. The Act states that "any person" who violates its terms is guilty of a misdemeanor. Ga. Off'l Code Ann. § 15–11–118. Therefore, the criminal statute operates against plaintiff Planned Parenthood of East Central Georgia, exposing plaintiff to an "injury in fact."

■ Plaintiff Planned Parenthood Association of the Atlanta Area, Inc. provides only abortion-related services. However, the settled law of standing holds that where one party has standing to bring an action, a court need not consider the standing of other plaintiffs. *Carey v. Population Services International,* 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977). Thus, because the standing of one plaintiff is clearly established, the court need not concern itself with the standing of the other.[13]

■ Once the standing issue of "injury in fact" is resolved, courts may as a pru-

---

**12.** In the "uncovered" counties remaining in plaintiffs' compilation, there are 55 superior court judges and 9 juvenile court judges. Tr. at 101. Only the juvenile court judges would have to travel to the county of the minor's residence, unless the minor agreed otherwise. Tr. at 101.

**13.** Plaintiffs argue that implementaion of the Act will cause the Atlanta facility, as part of its

duty to its patients, to immediately implement an intensified counseling service to assist its patients to resolve the new crises they allege will be created by the Act, resulting in increased costs. Such economic injury plaintiffs argue also establishes "injury in fact" under Article III. *Singleton v. Wulff,* 428 U.S. 106, 113, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

dential matter allow parties to assert the constitutional rights of others affected by the challenged legislation. *Carey, supra* 431 U.S. at 683, 97 S.Ct. at 2015; *Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976). Numerous cases firmly establish the right of abortion providers as well as physicians to assert the constitutional rights of their patients.[14]

In *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 333 (5th Cir.1981) (Unit B), the old Fifth Circuit held that an abortion facility could assert the constitutional claims of its potential women patients in challenging a municipality's zoning actions. *Id.* at 334. The court found that the plaintiff had standing to "assert the claims of pregnant women whose privacy rights would be 'diluted or adversely affected' should defendants' actions remain unchallenged." *Id.* at 334; (citing *Griswold v. Connecticut* 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965)).[15]

The court finds that plaintiffs have standing to bring this action on behalf of themselves and on behalf of their minor patients.

## II. MOTION FOR PRELIMINARY INJUNCTION

Currently before the court is plaintiffs' request for a preliminary injunction. The four factors a court must consider in granting preliminary injunctive relief in the Eleventh Circuit are:

(1) Is there a substantial likelihood that plaintiffs will prevail on the merits?

(2) Will plaintiffs suffer irreparable injury if injunctive relief is not granted?

(3) Does the threatened injury to plaintiffs outweigh the threatened harm the injunction will cause defendants?

(4) Will the granting of a preliminary injunction disserve the public interest?

*Callaway v. Block,* 763 F.2d 1283, 1287 (11th Cir.1985).

Plaintiffs, in their complaint, attack the constitutionality of the Georgia Parental Notification Act on numerous grounds. First, plaintiffs challenge the procedures for the verification of parental notification. § 15–11–112(a). Plaintiffs contend that the verification procedures of the Act unduly burden even a compliant minor whose parents do not object to her decision to seek an abortion. Plaintiffs further contend that some parents will know about but be unwilling to be involved in their daughter's abortion, and thus can exercise an impermissible *de facto* veto by refusing to accompany her to the abortion facility. Plaintiffs contend also that utilizing the "accompanying adult" option to verify notification violates the privacy rights of many minors and families who do not wish to reveal the pregnancy to an outsider.

---

**14.** *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328, 333 (5th Cir.1981) (Unit B); *American College of Obstetricians and Gynecologists v. Thornburgh,* 737 F.2d 283, 290 n. 6 (3d Cir.1984); *Mahoning Women's Center v. Hunter,* 610 F.2d 456, 458 n. 2 (6th Cir.1979); *Planned Parenthood of Minnesota v. Citizens for Community Act.,* 558 F.2d 861, 865 n. 3 (8th Cir.1977); *Friendship Medical Center, Ltd. v. Chicago Board of Health* 505 F.2d 1141, 1145–48 (7th Cir.1974); *Akron Center for Reproductive Health v. Rosen,* 633 F.Supp. 1123, 1128 (N.D. Ohio 1986); *Women's Medical Center of Providence v. Roberts,* 512 F.Supp. 316, 320–24 (D.R.I.1981); *Women's Services v. Thone,* 483 F.Supp. 1022, 1030 (D.Neb. 1979), aff'd, 636 F.2d 206, 210 (8th Cir.1980).

**15.** Defendant contends that although many courts have allowed abortion providers to raise the rights of their patients, they have done so only "in the context of cases which also include plaintiffs other than the abortion clinic." De-

fendant Post-Hearing Brief at 3. Defendant's argument rests on the inference, not supported by the cases defendant cites as authority, that the clinic's standing in those cases was contingent on the presence of other parties. *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird,* 428 U.S. 132 (1976) and *Bellotti v. Baird,* 443 U.S. 622, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1979); *H. L. v. Matheson,* 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981); *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983); *Planned Parenthood Association v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) and *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986).

Plaintiffs specifically allege that the verification provisions requiring appearance at the abortion facility by a parent or accompanying adult impermissibly add to the expense of the abortion by doubling the travel expenses involved, requiring parents or accompanying adults to lose pay and forcing them to incur child care costs for any young children at home. Plaintiffs contend the verification procedure would impermissibly delay abortions because of the need to coordinate the schedules of parents or other verifying adults with those of the clinic. Additionally, plaintiffs contend that the verification requirements breach the privacy of the minor and her family by requiring parents to explain absences from work or from home to employers, baby-sitters or another parent who does not know of the abortion.

Second, plaintiffs argue that the judicial bypass mechanism provided under § 15–11–112(b) as supplemented by the rules promulgated by the Supreme Court and the Court of Appeals is unconstitutional in that it fails to guarantee the minor an expeditious and anonymous procedure to seek waiver of the notification requirement. Plaintiffs contend that the judicial bypass mechanism including the newly promulgated rules fails to guarantee constitutionally adequate expediency because (1) the Act allows three days between the filing of the petition and the holding of the hearing, excluding Saturdays, Sundays and holidays, leading to a potential delay of up to six days between the filing of the petition and the holding of the hearing. § 15–11–113; (2) the delay between filing the petition and holding the hearing involves multiple trips to the courthouse; (3) the Georgia juvenile court system is not equipped to provide access to juvenile court adjudicators in every county; and (4) the statute makes no provision for the situation where the juvenile court fails to act.

Plaintiffs contend that the judicial bypass mechanism fails to guarantee anonymity to minors in need of an abortion by requiring a minor's signature on the petition filed to initiate the bypass procedure as well as a medical statement from a physician confirming the pregnancy and by requiring the use of the minor's initials, social security number and date of birth on the petition and any order issued by the Juvenile Court. Plaintiffs also contend that the Act's venue provisions impermissibly increase the risk that a minor's confidentiality will be breached because the Act allows the petition for waiver to be filed only in the minor's county of residence or the county where the abortion provider is located.

Plaintiffs also attack the judicial bypass mechanism on more general grounds. Plaintiffs contend that the Act creates an unconstitutional burden for those who must travel to obtain judicial waiver. Plaintiffs assail the statute for failing to provide personnel to assist the minor in filing the petition.

Plaintiffs further contend that the standard to be applied by the juvenile court in judging the minor's maturity is unconstitutionally high, requiring her to be capable of making the abortion decision "on her own" rather than in consultation with her physician.

## A. CONSTITUTIONAL STANDARD OF REVIEW

█ The Supreme Court has held that the fundamental "right of privacy, ... founded in the Fourteenth Amendment's concept of personal liberty, ... is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973); *see Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 2178, 90 L.Ed.2d 779 (1986) (specifically reaffirming *Roe v. Wade*). The right to choose abortion rather than childbirth is "not unqualified and must be considered against important state interests in regulation." *Roe v. Wade*, 410 U.S. at 154, 93 S.Ct. at 727. Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy. *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977).

983

■ The constitutional rights of minors do not receive lesser protection than the rights of adults. *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976) ("constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority"). Similarly, the burdens imposed by state regulation of abortion are no different for minors than for adults. *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed. 2d 797 (1979) *(Bellotti II).*

■ Consistent with the Supreme Court's traditional three-tiered analysis of substantive due process rights, restrictive regulation of a fundamental right such as the right to an abortion must be "subject to searching judicial examination" or strict scrutiny. *City of Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 428, 103 S.Ct. 2481, 2491, 76 L.Ed.2d 687 (1983).[16]

Where a regulation is subject to strict scrutiny, that regulation must be "narrowly drawn to express only the legitimate state interest at stake." *Carey v. Population Services International,* 431 U.S. 678, 686, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977).

■ The difference between abortion statutes that regulate adults and those that regulate only minors is that the state may promote a significant interest by statute that regulates minors, but would have no legitimate interest in applying that statute to adults. *City of Akron v. Akron Center*

*for Reproductive Health, Inc.,* 462 U.S. 416, 427 n. 10, 103 S.Ct. 2481, 2491 n. 10, 76 L.Ed.2d 687 (1983). For example, the state has a legitimate interest in promoting parental consultation with a minor who is seeking to obtain an abortion because of the minor's presumed inability to make important decisions in an informed, mature manner and the serious concerns implicated by a decision to have an abortion. *Bellotti II,* 443 U.S. at 634, 99 S.Ct. at 3043.

■ The state has a significant interest in promoting parental consultation with a minor before her decision to have an abortion. *Akron,* 462 U.S. at 427 n. 10, 103 S.Ct. at 2491 n. 10; *H.L. v. Matheson,* 450 U.S. 398, 409–10, 101 S.Ct. 1164, 1171, 67 L.Ed.2d 388 (1981). On the other hand, however, a mature minor or an immature minor in whose best interest it is to have an abortion has a constitutional right to have an abortion without notifying her parents. *Matheson,* 450 U.S. at 420, 101 S.Ct. at 1177; *Bellotti II,* 443 U.S. at 647, 99 S.Ct. at 3050. *Accord Akron* (parental consent statute); *Planned Parenthood, Kansas City, Mo., Inc. v. Ashcroft,* 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (parental consent statute). None of this diminishes the fundamental nature of the right or the level of scrutiny applied to restrictions on that right. *Danforth,* 428 U.S. at 74, 96 S.Ct. at 2843; *Bellotti II,* 443 U.S. at 633, 99 S.Ct. at 3043; *see Zbaraz v. Hartigan,* 763 F.2d 1532 (7th Cir.1985), juris. postponed in part, —— U.S. ——, 107 S.Ct. 267, 93 L.Ed.2d 245 (1986), *arg. de-*

**16.** A majority of the Supreme Court in *Akron* squarely rejected as "wholly incompatible with the existence of the fundamental right recognized in *Roe v. Wade*" the notion that a court should initially examine the magnitude of the restriction imposed by the regulation as a threshold inquiry to what level of scrutiny to apply. *Akron,* 462 U.S. at 420 n. 1, 103 S.Ct. at 2487 n. 1. Such an erroneous analysis would undermine the entire three-tiered analysis applied by the Supreme Court since *United States v. Carolene Products,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). Of course, it is a familiar hornbook proposition that those rights deemed to be "fundamental" receive "strict scrutiny" while non-fundamental

rights are subject only to the "rational basis test." *See Nowak, Rotunda & Young, Constitutional Law* Part 3, Ch. 3, p. 416 (1978); Tribe, *American Constitutional Law,* § 11–4, p. 575 (1978); *see generally Carolene Products, supra* 304 U.S. at 152 n. 4, 58 S.Ct. at 783 n. 4; *Murdock v. Pennsylvania,* 319 U.S. 105, 115, 63 S.Ct. 870, 876, 87 L.Ed. 1292 (1943); *Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Courts have created a middle tier for "important" rights such as the right to run for public office *see Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) which are subject to heightened or intermediate scrutiny.

ferred, — U.S. ——, 107 S.Ct. 1600, 94 L.Ed.2d 787 (1987).[17]

■ The Supreme Court has not specifically ruled on the constitutionality of a parental notification statute as opposed to a parental consent statute. *Cf. Matheson supra* (involving a notification statute, but disposed of on standing grounds).[18] However, the parties agree that the Supreme Court cases dealing with the propriety of parental consent statutes control the validity of a notification requirement. Courts have uniformly adopted this approach. *Indiana Planned Parenthood Affiliates Association, Inc. v. Pearson*, 716 F.2d 1127 (7th Cir.1983); *Zbaraz v. Hartigan*, 763 F.2d 1532 (7th Cir.1985); *Glick v. McKay*, 616 F.Supp. 322 (D.Nev.1985); *Akron Center for Reproductive Health v. Rosen*, 633 F.Supp. 1123 (N.D.Ohio 1986); *Hodgson v. Minnesota*, 648 F.Supp. 756 (D.Minn.1986) *aff'd*, 827 F.2d 1191 (8th Cir.1987).

Defendant argues, however, that no judicial alternative to the notification requirement is constitutionally required, and therefore, that the bypass provisions of the Act represent "an additional, but purely gratuitous, accommodation of the interest

of Georgia minors." Defendant's Post Hearing Brief at 19.

While the Supreme Court has not specifically ruled on the necessity of a judicial alternative to a "notification" statute, the *Akron* decision instructs that the court contemplated such a requirement. In its recitation of the law on minor's abortion rights, the court said that "state and parental interests must give way to the constitutional right of a mature minor or of an immature minor whose best interests are contrary to parental involvement." *Akron*, 462 U.S. at 427 n. 10, 103 S.Ct. at 2491 n. 10. Further, in reviewing the parental consent ordinance at issue in that case, the court stated that,

> [T]he statute makes no provision for a mature or emancipated minor to completely avoid hostile parental involvement, by demonstrating to the satisfaction of the court that she is capable of exercising her constitutional right to choose an abortion. On the contrary the statute requires that the minor's parents be notified once a petition has been filed, § 2151.28, a requirement that in the case of a mature minor seeking an abortion

**17.** The statement in *Akron*, 462 U.S. at 420 n. 1, 103 S.Ct. at 2487 n. 1, clarifies some unnecessary confusion in the lower courts which have occasionally reviewed restrictions on minor's rights to abortion under a rational basis standard. *see e.g. Planned Parenthood v. Bellotti*, 641 F.2d 1006 (1st Cir.1981) *rev'd Bellotti II.* Clearly analyzed and stated, the state's additional significant interest in protecting minors that is not present in protecting adults is sufficient to regulate minor's abortion rights. This may in some sense dilute the strength of the right relative to that of an adult. However, this dilution has no effect on the importance of the right (e.g. whether it is fundamental or not). This is merely another way of saying that the level of interest required of the state to regulate a fundamental right, (e.g., whether the interest constitutes a compelling state interest), has no bearing on defining whether the right is fundamental or not. Likewise, the fact that the state can regulate a minor's abortion rights based only on its significant interest in promoting parental consultation says nothing about the level of scrutiny to be applied. Simply stated, regulation of a fundamental right receives strict scrutiny regardless of the Holder of the right. *Cf. Mississippi University for Women v. Hogan*, 458 U.S. 718, 724 n. 9, 102 S.Ct. 3331, 3336 n. 9, 73 L.Ed.2d 1090 (1982) ("[W]hen a classification expressly

discriminates on the basis of gender, the analysis and level of scrutiny applied to determine the validity of the classification do not vary simply because the objective appears acceptable to individual Members of the Court. While the validity and importance of the objective may effect the outcome of the analysis, the analysis itself does not change.").

**18.** A plurality of the Court opined in *Bellotti II* that consent statutes which provided an expeditious and anonymous judicial bypass would be constitutional. In *Planned Parenthood Assoc. v. Ashcroft*, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed. 2d 733 (1983), a majority of the Court found facially constitutional a Missouri consent statute, which had been enjoined prior to its effective date. The Supreme Court has yet to be faced with the question whether a consent or notification statute *in actual operation* is constitutional as applied, however. *See Hodgson v. Minnesota*, 648 F.Supp. 756, 775 (D.Minn.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1333, 94 L.Ed.2d 184 (1987) *aff'd*, 827 F.2d 1191 (8th Cir.1987) (finding that parental notification statute in effect for five years unduly burdened constitutional rights and failed to "further[ ] in any meaningful way the state's interest in protecting pregnant minors or assuring family integrity").

would be unconstitutional. *See H.L. v. Matheson*, 450 U.S. at 420 [101 S.Ct. at 1177] (Powell, J. concurring), *id.* at 428 n. 3 [101 S.Ct. at 1181 n. 3] (Marshall, J. dissenting).

*Id.* at 441 n. 31, 103 S.Ct. at 2498 n. 31.[19]

Every federal court that has considered a parental notice law since *Akron* has taken the above-quoted language as a mandate for a judicial alternative to parental notice laws. The Seventh Circuit remarked that "this issue has now been settled." *Indiana Planned Parenthood Affiliates v. Pearson*, 716 F.2d 1127, 1132 (7th Cir. 1983).[20] *Accord Zbaraz, supra* at 1539; *American College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d 283, 297 (3d Cir.1984); *Akron Center for Reproductive Health v. Rosen*, 633 F.Supp. 1123, 1132 (N.D.Ohio 1986); *Hodgson v. Minnesota*, 648 F.Supp. 756, 773 (D.Minn. 1986) *aff'd*, 827 F.2d 1191 (8th Cir.1987); *Glick v. McKay*, 616 F.Supp. 322, 325 (D.Nev.1985).

Courts recognizing "as a practical matter, [that] a notification requirement will have the same detrimental effect on a minor having an abortion as a consent statute has," have also rejected any suggestion that the standards for such a judicial bypass should be less stringent where notice laws are involved. *See e.g., Pearson*, 716 F.2d at 1132; *Hodgson v. Minnesota*, 827 F.2d 1191 (8th Cir.1987). Therefore, Georgia must provide a judicial alternative to parental notification.

■ The Supreme Court has held that a statute requiring parental involvement is constitutional where it does not "unduly burden" a minor's right to an abortion. *Matheson supra* and *Bellotti, supra*. Therefore, there is no question that a state can by statute require notification by a minor of her parent(s) prior to her exercising the right to an abortion. The question is whether the Georgia Parental Notification Act is narrowly tailored to promote the state's significant interest in promoting parental consultation prior to the abortion decision so as not to "unduly burden" that right.[21]

■ Defendant at the hearing and in his briefs argues that "where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality." *Ashcroft supra*, 462 U.S. at 493, 103 S.Ct. at 2526. The soundest construction of this interpretive aid is to hold that where statutory language is subject to two reasonable interpretations, one constitutional and one not, a court should adopt the interpretation that avoids the constitutional difficulty. *See* 2 A C. Sands, Sutherland Statutory Construction § 45.11. However, where the plain meaning of the language is clear and unambiguous, that language controls the interpretation of the statute. *Scarborough v. Office of Personnel Management*, 723 F.2d 801, 816–17 (11th Cir.1984). With these principles in mind, the court examines plaintiffs' numerous attacks on the Georgia statute.

## B. CHALLENGE TO THE ACT

### 1. *Notification Requirement*

Plaintiffs argue that the notification requirement found in §§ 15–11–112 and 118 of the Act unduly burdens a minor's right

---

**19.** In *Matheson*, the Supreme Court upheld a Utah notification law which had no judicial bypass, but the court explicitly confined its decision to the plaintiff before it—a dependent unemancipated minor who made no claim or showing "as to her maturity or as to her relations with her parents." *Id.* 450 U.S. at 407, 101 S.Ct. at 1170. The court explicitly reserved ruling on the merits of this or any other statute as applied to other minors. *Id.* at 414 n. 25, 101 S.Ct. at 1173 n. 25.

**20.** The Seventh Circuit noted that footnote 31 in the *Akron* case was not dictum. "The court's conclusion that notification was unconstitutional was necessary to its holding that obstruction was inappropriate and that the evidence provided no acceptable means for determining whether a minor was emancipated or mature." 716 F.2d at 1132 n. 2.

**21.** The court notes well that a requirement unduly burdensome in operation will be struck down even if not clearly invalid on its face. *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1012–13 (1st Cir.1981); *Hodgson v. Minnesota*, 648 F.Supp. 756, 774 (D.Minn. 1986) *aff'd*, 827 F.2d 1191 (8th Cir.1987) (*citing Carolene Products, supra*, 304 U.S. at 153, 58 S.Ct. at 784).

to an abortion. Plaintiffs' central argument is that the requirement as written adds expense, delay and other difficulties to the process of obtaining an abortion for the minor who has willingly involved a parent in her abortion decision. Furthermore, plaintiffs argue that these burdens are not alleviated by requiring the family to breach its privacy by informing another person of the abortion and having that person accompany the minor to the abortion facility. Plaintiffs' Post-Hearing Brief at 3–4; Plaintiffs' Reply Brief at 6.

As previously noted, verification of notification may be accomplished by having the minor's parent or guardian accompany her to the abortion facility and furnish an affidavit that he or she is the minor's parent or guardian. Otherwise, the minor must find another adult to accompany her to the facility and furnish an affidavit to the effect that a parent or legal guardian of the minor has been notified. Ga. Off'l Code Ann. § 15–11–112(a)(1)(A) and (B).

Plaintiff has introduced evidence at hearing that major providers of abortion services are few and far apart in Georgia. Apart from isolated instances of abortions performed by private physicians in their offices or hospitals, abortions in Georgia are available in only four locations—the metropolitan areas of Augusta, Atlanta, Columbus and Savannah. Second trimester abortions are offered only in Atlanta and Savannah while abortions performed after 18 weeks of gestation are performed in Atlanta only. July 16–17, 1987 Hearing, Transcript at 58–62. Plaintiffs introduced ample evidence that over 90% of minors obtain abortions at these four locations. Tr. at 14. Plaintiffs demonstrated that 51 percent of women aged 15 to 17 who reside in Georgia live outside those four metropolitan areas. Tr. at 14. In addition, plaintiffs showed that about a fourth of the minors obtaining abortions in Georgia travelled 50 miles or more to obtain abortions. Tr. at 14. Some Georgia residents travel over 200 miles for a second trimester abortion in Atlanta. *Id.;* Tr. at 34–35.

Defendant at hearing questioned this evidence but failed to specifically refute it.

Consequently, the court finds that many minors face significant long distance travel to obtain an abortion, as do adult women. The costs associated with this travel including bus or airplane fare, meals and lodging will be doubled if another adult must accompany the minor. Tr. at 35–39; 166. Delays will result from the need to coordinate clinic schedules with the work schedules of parents and accompanying adults. Tr. at 39–41. The possibility of obtaining an abortion on a weekend might alleviate work scheduling difficulties for parents or adults who are employed on weekdays, but would result in the additional delay of waiting for a weekend day to obtain the abortion. *Id.* Delay can result in increased health risks and more expensive abortions. Tr. at 156; 41–42. Scheduling difficulties are exacerbated with a second trimester abortion which is performed over the course of two days. Tr. at 39–41.

Plaintiffs' witnesses asserted that other burdens will result including loss of pay for blue collar adults employed in jobs without paid leave privileges and child care expenses for younger children that remain at home. Tr. at 37 and 166. Plaintiffs contend that the potential for breaches of confidentiality will increase as parents or accompanying adults must explain the reasons for their absence from work. *Id.*

The state is required to show that such a regulation is "narrowly drawn" to further the state's significant interest in promoting parental consultation. *Zbaraz v. Hartigan,* 763 F.2d at 1537; *Accord Akron,* 462 U.S. at 435–36, 103 S.Ct. at 2495; *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed. 2d 201 (1973). This the state has failed to demonstrate.

At the June 30, 1987 hearing on the motion for temporary restraining order, defendant raised the argument that any burden created by the requirement that a parent go to the abortion facility with their daughter is alleviated by the option of utilizing an "accompanying adult" to verify notification. Defendant pressed the argument there, not mentioned again in any brief, that an employee of the abortion facility could satisfy the "accompanying

adult" provision by telephoning the parent and then making out an affidavit to that effect. The court feels this argument is meritless.

The plain meaning of the phrase "accompanying adult" does not contemplate an individual located on the facility-premises. The common use of the word "accompany" is "to go with or attend as an associate or companion." Webster's New Collegiate Dictionary (1980).[22]

Second, if the Georgia legislature had intended that notification be accomplished by facility personnel it could have done so clearly and unambiguously as have numerous other state legislatures. *See Zbaraz v. Hartigan,* 763 F.2d 1532 (Illinois statute allowing clinic personnel to initiate and verify parental notification in person, by telephone or by signed notarized statements); *Hodgson v. Minnesota,* 648 F.Supp. 756 (D.Minn.1986) (mail notice permitted); *Akron Center for Reproductive Health v. Rosen,* 633 F.Supp. 1123 (D.Ohio 1986) (in person or by telephone).

Third, an interpretation construing facility personnel as an "accompanying adult" would render nonsensical the provision in § 15–11–117 that such personnel may in good faith rely on the "representations of ... any accompanying adult purporting to give an affidavit required under this article." This provision would be unnecessary if the clinic could merely rely on verification provided by its own personnel. Ga. Off'l Code Ann. § 15–11–117.

Defendant in his brief argues that the "accompanying adult" option relieves any burden caused by the parental attendance requirement because the accompanying adult need not be from the minor's hometown. Defendants' Post-Hearing Brief at 17. While there is a theoretical possibility that a minor who lives in an area remote from the metropolitan areas where the vast majority of abortions are performed might be well enough acquainted with an adult in the locality of the abortion provider who could serve as the accompanying adult, such a possibility is most unlikely.

Regardless, requiring the minor, or her nonobjecting parent, to involve an outsider to the nuclear family unit in seeking an abortion for the minor imposes a substantial and unnecessary burden upon the minor's rights. This requirement breaches the other branch of the right to privacy recognized by the Supreme Court in *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977)[23]; the interest in avoiding disclosure of personal matters. The court feels few matters are more personal to a young woman and her parents, or less appropriate for disclosure, than her decision whether to abort her pregnancy. Such a requirement is in no way compatible with the Supreme Court's directive in *Thornburgh* that the right to abortion "without public scrutiny" be preserved. 476 U.S. at ——, 106 S.Ct. at 2182.

The burden of verification increases when the minor's parents object to the abortion. In that instance, the minor is faced with locating an adult who, knowing that her parents object to the abortion, will nevertheless accompany her to an abortion clinic.

Given the number of constitutionally valid verification measures employed by other states including telephone notice and mail notice, this court can say without hesitation that the attendance requirement of a parent or accompanying adult is not narrowly drawn and does unduly burden the minor's rights. Under the Georgia statute, no matter how thoroughly discussed and well considered the decision to terminate a pregnancy may be, a family acting in good faith compliance with the

---

22. In construing a statute, great weight must be given to the plain meaning of the words used in an effort to determine the intent of the legislature. *Garren v. The Southland Corp.,* 235 Ga. 784, 785, 221 S.E.2d 571 (1976) (Hall, J.). *See* Ga. Off'l Code Ann. § 1–3–1(b) ("in all interpretations of Statutes, the ordinary signification shall be applied to all words ...")

23. There the court recognized that the cases defining the right to privacy involve two different kinds of interests: (1) the individual interest in avoiding disclosure of personal matters, and (2) the interest in independence in making certain decisions. The first interest is implicated here. *Id.*

statute may not be able to implement that decision without unnecessary, costly and medically dangerous delay and expense. Such a family also might not be able to implement that decision without involving outsiders in their most intimate affairs. *Accord Zbaraz,* 763 F.2d at 1538.

■ In addition to the burdens of cost, delay and breach of privacy, plaintiffs argue that the statute can, in the case of a minor whose parent or other adult is unable or unwilling to accompany the minor to an abortion facility, act as a *de facto* parental veto such as that struck down in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976). Under the Act, the judicial bypass mechanism is available "[i]f the unemancipated minor elects not to comply with the notification requirement." § 15–11–112(b). The statute makes no provision for a minor who has notified her parents, but cannot secure verification from a parent or other adult. Assuming the judicial bypass mechanism is open to such a minor, the juvenile court may under the standards set forth in the Act refuse to waive the notification requirement because she is immature and notification is in her best interests, yet leave the minor unable to obtain an abortion because the minor has no one to verify that notification has taken place. Where parents wish to obstruct the minor from obtaining the abortion, this gap in the statutory scheme operates to allow them to exert a *de facto* veto over their daughter's decision. This situation violates the Supreme Court's rulings expressed in *Bellotti* and *Danforth* that parents may not be given veto power over their daughter's choice of abortion. This finding underscores the court's earlier discussion of the statute's need for alternatives to the current verification requirements.

2. *Judicial Alternative to Parental Notification*

■ If the state chooses to enact a law requiring parental involvement, it must provide an alternative procedure for the minor to seek a waiver of the requirement from a judge or other neutral third party. *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). *See* discussion *supra.* Such an alternative is mandatory because "there are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible." *Id.* at 642, 99 S.Ct. at 3048. The constitutional requirements for the alternative procedure are as follows:

1) The minor woman must have access to the alternative procedure without first consulting her parents. *Id.* at 647, 99 S.Ct. at 3050.

2) If the court (or other neutral tribunal) finds the minor woman to be mature enough to consent to the abortion in consultation with her physician without parental involvement, it must waive the parental consent requirement and allow the minor to obtain an abortion on her own consent. *Id.* at 643, 99 S.Ct. at 3048.

3) If the court finds the minor woman immature, it must nevertheless authorize the abortion without parental consent if the abortion would be in the minor woman's best interests. *Id.* at 644, 99 S.Ct. at 3049.

4) The proceedings must be anonymous and sufficiently expedited to give the minor woman an effective opportunity to exercise her constitutional rights. *Id.*

a) *Expeditious Judicial Waiver*

In *Ashcroft,* the Supreme Court upheld the Missouri parental consent statute's provision providing for expeditious appeals, which provided that:

> The notice of intent to appeal shall be given within twenty-four hours from the date of issuance of the order. The record on appeal shall be perfected within five days from the filing of notice to appeal. Because time may be of the essence regarding the performance of the abortion, the supreme court of this state shall, by court rule, provide for expedited appellate review of cases appealed under this section.

Mo.Rev.Stat. § 188.028.2(6) (Supp.1982).

The Court held that "this section provides the framework for a constitutionally sufficient means of expediting judicial pro-

ceedings." 462 U.S. at 491 n. 16, 103 S.Ct. at 2525 n. 16. Although the state supreme court had not promulgated any rules assuring expediency at the time the case was heard, the Court stated that it had "no reasons to believe that Missouri will not expedite any appeal consistent with the mandate in our prior opinions." *Id.*

Defendant by comparing the provisions of the Georgia Act to the Missouri Act contends that Georgia's bypass scheme is *a fortiori* constitutional. *Ashcroft*, however, dealt with a statutory scheme where the state supreme court rules requested had not yet been promulgated. The Court in *Ashcroft* refused to assume that the state supreme court rules would be constitutionally inadequate. *Ashcroft* at 491 n. 16, 103 S.Ct. at 2525 n. 16. This approach, however, does not foreclose a lower court's review of existing supplemental rules in order to determine their constitutional sufficiency. In *Thornburgh v. American College of Obstetricians and Gynecologists*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), the Court remanded to the district court for consideration "in the first instance" the constitutionality of Pennsylvania's parental consent law as implemented by newly enacted rules of court. *Id.* at 2177 n. 9. The district court in *Thornburgh* stated, "unlike the Supreme Court [in *Ashcroft*], I am confronted with a complete statutory scheme which expressly permits the judicial proceedings to take up to 23 days. This is an important difference. *See Akron Center for Reproductive Health v. Rosen*, 633 F.Supp. 1123, 1142 (N.D.Ohio 1986). I must determine whether such a 23 day delay in the minor's ability to obtain an abortion is constitutional." 656 F.Supp. 879, 887 (E.D.Pa.1987). This court is charged with the same responsibility in ruling on the Georgia Act.

### i. *Statutory Timetable*

While the timetable set forth in *Ashcroft* is not directly controlling of the outcome of this case, the provisions of the Missouri statute upheld there are good indicia of what the Supreme Court feels is acceptable in terms of expediency. The provisions of the Act as supplemented by the new juvenile and appellate rules are similar but not identical to those in the Missouri statute.

In Georgia, the Act requires the Juvenile Court hearing to be held within three days of the day the minor files the petition, excluding Saturdays, Sundays and holidays. Ga. Off'l Code Ann. § 15–12–113. Juvenile Court Rule 23.6 requires a certified copy of the order to be furnished to the minor within 24 hours of the hearing. The Missouri statute required a hearing to be held within five days without specifying whether Saturdays, Sundays and holidays were excluded. Missouri's statute did not put a time limit on the time for decision by the juvenile court.

If the juvenile court denies the minor's waiver petition, Court of Appeals Rule 51(c) requires a certified copy of the order along with the notice of appeal to be filed in Atlanta with the Clerk of the Court of Appeals. Within five calendar days of the date of filing of the Notice of Appeal, the record from the juvenile proceeding must be received at the Court of Appeals in Atlanta. *Id.* Within five calendar days of receiving the record, the Court of Appeals must rule. Rule 51(e).

The Supreme Court ruled on the Missouri statute as it stood before a court rule covering appeal time was adopted. The rule adopted by the Missouri Supreme Court and approved in *T.L.J. v. Webster*, 792 F.2d 734 (8th Cir.1986) states only that "appellate review of cases appealed under Section 188.028.2(b), RS Mo. shall be expedited." *See* Missouri Rule of Civil Procedure 84.02. Thus, Georgia requires a stricter timetable than does the Missouri statute upheld in *Ashcroft* and *Webster*.

Plaintiffs argue that applying the Georgia timetable to a hypothetical minor and assuming ideal circumstances (e.g. the minor lived near an abortion facility in Atlanta and filed her petition in an Atlanta juvenile court), the process could take nearly three weeks.

Several district courts ruling on similar statutes have held that similar delays create an unconstitutional burden. *Akron Center for Reproductive Health v. Rosen,*

633 F.Supp. 1123, 1143–44 (N.D. Ohio 1986) (three week period between filing petition and decision on appeal ruled unconstitutional); *American College of Obstetrics and Gynecology v. Thornburgh*, 656 F.Supp. 879, 887–88 (E.D.Pa.1987) (twenty-three day delay held unconstitutional); *see also Glick v. McKay*, 616 F.Supp. 322, 326 (D.Nev.1985) (three weeks for waiver proceeding unconstitutionally long).

The court, although cognizant of the concerns of these courts, finds them legally unpersuasive. Where the Supreme Court has upheld the Missouri statute which on its face portends of a longer delay than the Georgia statute and where the Eighth Circuit has specifically upheld a state supreme court rule supplementing that statute which provides only that such appeals "shall be expedited," this court cannot say that the timetable of the Georgia Act fails to guarantee constitutionally adequate expedition of the judicial alternative. The court feels that, if met, the timetable set forth in the Act provides the requisite established and practical avenue for a minor seeking access to the judicial bypass mechanism. *See American College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d at 297.

### ii. *Georgia Juvenile Court Structure*

■ Plaintiffs presented evidence that on a given day there will be no Juvenile Court adjudicator present in as many as 60 of Georgia's 159 counties. This situation, plaintiffs argue, adds to the delay and travel minors may experience in seeking judicial waiver. However, the Act contemplates a hearing on the waiver issue within *three* days of filing of the petition. The adjudicator need not be present at the time and place of filing. Furthermore, the three day period provides a reasonable time for a hearing to be set while not unduly delaying the waiver procedure. *See* discussion *supra.*

Plaintiffs argue the evidence shows that minors will have to travel to the county where the appropriate judge is sitting rather than arranging to hold the hearing in

the minor's home county. Tr. at 100–102. Plaintiffs, however, in contesting the restrictive venue provisions of the Georgia Act *see* discussion *infra* argue that the venue for filing the initial petition should be expanded to include countless adjacent to the minor's home county in order to reduce the risk that she will be recognized and her anonymity breached. This argument contemplates that a significant number of minors would want to travel to a venue where the chance of recognition is reduced. However, requiring the judge to travel to the minor's county of residence while decreasing the minor's travel time and expense, would increase the minor's risk of identification in her home county. Requiring the minor to travel to the place the judge is sitting would do just the reverse.

The Court feels that the evidence on the current record, though indicating some burden on the minor, is insufficient to conclude that the Georgia Juvenile Court System suffers from systemic defects significant enough to unduly burden minor's rights by denying minors an expeditious waiver hearing. *See Hodgson v. State of Minnesota*, 648 F.Supp. 756, 763 (D.Minn.1986) *aff'd*, 827 F.2d 1191 (8th Cir.1987).

### iii. *Where Court Fails to Act*

■ Plaintiffs contend that while the Act allows for an appeal "when the court denies a waiver of notice," § 15–11–114(e), no procedures are available when the juvenile court simply fails to act. The court presumes that the judges of the Georgia juvenile court system will discharge their duties in a timely manner. The current record is insufficient to indicate otherwise.

In the unlikely event that those courts fail to act within the period of time specified under the new juvenile court rules, the court assumes that consistent with the Act's mandate that the judicial waiver proceeding be expedited, the petition will be deemed denied and the minor may appeal such denial to the Georgia Court of Appeals.[24] Otherwise, the Act and rules

---

**24.** Section 15–11–114(a) provides that the minor will have the benefit of court-appointed counsel.

Where the juvenile court fails to act within the time specified, presumably counsel would ap-

would not guarantee the minor constitutionally adequate expediency. *But see American College of Obstetricians and Gynecologists v. Thornburgh*, 656 F.Supp. 879, 888–89 (E.D.Pa.1987) (striking down a parental consent statute for failure to provide for where the juvenile court fails to act).

### b) *Anonymity*

■ Plaintiffs argue that the Georgia Act and supplementary rules fail to assure that the minor can proceed through the judicial bypass mechanism anonymously because they require that the minor's name, Social Security number and birth date appear on certain court documents. In contrast, plaintiffs argue, the Missouri statute upheld in *Ashcroft* permitted the minor seeking a court waiver of that state's parental notice requirement to proceed using her initials only. *Id.* 462 U.S. at 491 n. 16, 103 S.Ct. at 2525 n. 16.[25] In fact, the Eighth Circuit opinion, affirmed by the Supreme Court, confirmed that the Missouri provision did not require the minor's name saying "we are satisfied that anonymity is sufficiently protected by these procedures, which do not require the minor to disclose her name." 655 F.2d 848, 860 (8th Cir.1981).

The new Juvenile Court Rules allow the petition seeking waiver to be "styled" using only the minor's initials. However, the minor must sign the petition with her full name. Juvenile Court Rule 23.1, 3.8 and Form JUV 87–18. Testimony of Mr. Perrin, July 16, 1987 Hearing, Tr. at 106.[26] The minor must also supply "a statement from a licensed medical doctor confirming the pregnancy and current trimester of gestation" attached to the petition which plaintiffs assert will undoubtedly contain her name. *Id.* Moreover, both the form petition and any order entered by the juvenile court must contain the minor's Social Security number and date of birth. Juvenile Court Rule 23.6 and form JUV 87–18.

Social Security numbers now approximate "universal personal identifiers" through which much information on an individual can be gathered. *See* 120 Cong. Record 31, 812 (September 19, 1974) (description of Congress' concern with the proliferation of the number as an identifier and the need for a moratorium on its use). For example, federal law specifically requires as part of the Aid to Families with Dependent Children program (AFDC), that all recipients of welfare benefits, including minors be identified with a Social Security number. 42 U.S.C. § 622(a), 45 C.F.R. 205.-52. Food stamp recipients must also be identified with their Social Security numbers. 7 U.S.C. § 2025(e). Banks and employers habitually use Social Security numbers to identify their customers and employees. A minor with a checking account may have her number printed on her checks. For a teenage girl, a student identification card as well as her grade reports may contain her Social Security number. Such a requirement unnecessarily increases a minor's risk of identification by court personnel, members of other state agencies, and the public.

The Act makes no provision for juvenile court documents to be sealed. The Georgia law for sealing juvenile court records applies only to delinquent and unruly minors. Ga. Off'l Code Ann. § 15–11–61. New Court of Appeals Rule 51(j) provides for sealing records only when the minor has filed an appeal. Although admirably including several provisions to aid in main-

---

peal immediately to the Georgia Court of Appeals.

**25.** Oddly, the Court made this holding although the Missouri statute clearly required that "the petition shall be signed by the minor or the next friend." Mo.Rev.Stat. § 188.028.2(1). Courts since *Ashcroft* have uniformly read footnote 16 as approving only the use of initials in bypass proceedings. *Akron Center for Reproductive Health v. Rosen*, 633 F.Supp. 1123, 1143 (N.D. Ohio 1986); *Zbaraz, supra* at 1542.

**26.** The Act provides that the petition may be signed by the minor's "next friend". *Id.,* Tr. at 113. However this requirement either fails to protect the privacy of the minor who chooses to come to court alone or impermissibly requires the minor to breach her right of privacy in nondisclosure of personal matters by involving another person in her pursuit of an abortion. *See* text accompanying note 23 *supra.*

taining the minor's anonymity, the Act and rules do not go far enough. In *Akron Center for Reproductive Health v. Rosen,* 633 F.Supp. 1123 (N.D. Ohio 1986), *appeal dismissed without opinion,* 805 F.2d 1033 (6th Cir.1986), the court noted that while the statute did allow the minor to use a pseudonym, it failed to ensure confidential record-keeping, and was therefore insufficient to guarantee her anonymity. Additionally, the court stated:

> Moreover, there are no indications of how clerks offices shall assure that the record of these cases will be distinguished from the records of all other cases which are available to the public. Nor are there measures for the storage of the record after the case is closed to prevent its public availability.

633 F.Supp. at 1143–44.

This risk is significantly enhanced given the limited venue provisions that require a minor to seek waiver in her home county or that of the abortion provider. However, the court does not feel the venue provisions are unconstitutionally restrictive in and of themselves. *See Rosen,* 633 F.Supp. at 1144.

Other states have constitutionally fulfilled their bureaucratic needs while assuring the minor's anonymity. In both Ohio and Massachusetts statutes permitting the minor to proceed under a pseudonym and sign the petition using the same pseudonym have been promulgated. *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1025 (1st Cir.1981) (upholding the provisions as assuring anonymity);[27] *Akron Center for Reproductive Health v. Rosen,* 633 F.Supp. 1123, 1143 (N.D. Ohio 1986) (commenting positively on such a provision but striking down the statute for nevertheless failing to assure anonymity).

The Supreme Court in *Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) in striking down a Pennsylvania law requiring a woman seeking an abortion to file a report with a state agency stated:

> Pennsylvania's reporting requirements raise the spectre of public exposure and harassment of women who choose to exercise their personal, intensely private right with their physicians to end a pregnancy. Thus, they pose an unacceptable danger of deterring the exercise of that right and must be invalidated.

*Id.* at 2182. The statute there required neither the woman's name, Social Security number, nor date of birth, but contained enough information about her and the circumstances of the abortion to convince the court that identification was likely.[28]

The court finds that the requirement of the use of the minor's name and Social Security number, and the lack of specific provision for confidential record-keeping, fail to assure constitutionally adequate anonymity. The court feels that these defects can be easily remedied by amending New Juvenile Court Rule 23 to provide that *all* juvenile court records be sealed.

Plaintiffs further argue that the judicial bypass mechanism is unconstitutional because it fails to make provisions for closing the juvenile court hearing to the public. The court, however, disagrees and specifically reads the language in Ga. Off'l Code § 15–11–114(b) providing "all court proceedings under this code section shall be conducted in a manner to preserve the anonymity of the parties" as requiring closed hearings. Any practice varying with this interpretation would be a clear violation of the minor's rights.

#### c) *Other Attacks on the Statute*

Plaintiff raises several other more general attacks on the constitutionality of the Georgia judicial bypass mechanism.

---

27. An affidavit setting forth her true name is sealed and kept in a separate file. Superior Court Standing Order No. 12–80, *reprinted in Bellotti* 641 F.2d at 1025.

28. At hearing, Mr. Perrin testified that the purpose of the number is to identify the court order so no one else but the minor could use the order. Tr. at 112, 113. As plaintiffs point out, this does not explain why the juvenile court could not use another unique numerical identifier that would better protect the minor's anonymity.

### i. Multiple Trips to the Courthouse

Plaintiffs charge that the statute and rules together contemplate at least two and probably three trips to the "courthouse" in order to comply with the judicial bypass procedures on the juvenile court level: (1) to file the petition, (2) to attend the hearing three days later, and (3) to pick up the copy of the order within twenty-four hours of the hearing. Plaintiffs argue that these requirements place an especially excessive burden of cost and delay on minors who, out of concern for their privacy, file their petitions in the county of the abortion provider.

Plaintiff, however, cites this court no cases in which the burden of travelling to initiate and pursue a judicial waiver alternative has been held overly burdensome. On the contrary, the Missouri statute upheld in *Ashcroft* contemplated similar burdens. The district court in *Hodgson v. Minnesota*, 648 F.Supp. at 763, *aff'd*, 827 F.2d 1191 (8th Cir.1987) specifically found that although burdensome, trips to other counties to exercise the waiver option did not render such a plan unconstitutional. *Id.*

As long as a judicial bypass mechanism is constitutionally required, as it is here, there will be inevitable burdens involved in accessing that mechanism. This court feels that in the context of the Georgia scheme which on its face assures a prompt waiver hearing and decision in accord with constitutional standards, the burdens of seeking access to this system are constitutionally tolerable.

### ii. Standards for Granting Waiver

The Act provides that the waiver of the minor's petition must be granted if the "unemancipated minor is mature and well-informed enough to make intelligently the abortion decision *on her own.*" Ga. Off'l Code Ann. § 15–11–114(c)(1) (emphasis added). Plaintiff argues that this section requires that minors meet a higher standard of competence than adult women whose right to abortion is the right to make their decision *in consultation with their physicians. Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

Defendants counter that plaintiffs' reading is not a reasonable interpretation of the statute, and that the language "on her own" refers to whether the minor is mature enough to make the decision without parental involvement.

The court believes that the language of § 15–11–114(c)(1) is subject to two reasonable interpretations; defendant's which is constitutional and plaintiffs' which is not. Where such a situation exists this court will adopt the interpretation that avoids the constitutional difficulty. *See* discussion *supra*. The court reads the language of the statute to encompass the standard that: the unemancipated minor is mature and well-informed enough to make intelligently the abortion decision in consultation with her physician, but without the participation of her parents.

### iii. Failure to Provide Personnel to Assist the Minor in Filing the Petition

Plaintiffs argue that the Act is constitutionally defective because no provision is made in the statute or court rules for prompt access to court personnel to assist the minor in filing the petition. While some statutes have provided for such assistance, *see Ashcroft* 462 U.S. at 479 n. 4, 103 S.Ct. at 2519 n. 4, no court has explicitly held that the absence of such a provision rendered such a statute unconstitutional. *Cf. American College of Obstetricians v. Thornburgh*, 737 F.2d 283, 297 (3d Cir.1984) (enjoining the Pennsylvania statute because it did not contain any of the provisions present in the Missouri statute upheld in *Ashcroft* that created an "established and practical avenue" for obtaining judicial waiver). In fact, the district court in *Zbaraz v. Hartigan*, 584 F.Supp. 1452, 1462 (N.D.Ill.1984) specifically found that the failure to provide assistance did not render the statute at issue in that case unconstitutional.

The court believes that the presence of such a provision aiding minors in completing their petition while helpful to both the state and the minor, is not constitutionally necessary.

## CONCLUSION

Plaintiffs have met the requirements for granting a preliminary injunction, *Callaway*, 763 F.2d at 1287, and the court GRANTS plaintiffs the requested injunctive relief enjoining the implementation of the Georgia Parental Notification Act.

■■■ The court has found that, (1) the verification procedures of the Act are unconstitutionally burdensome and fail to provide adequate alternative means of verification; (2) the newly promulgated Juvenile Court Rules requiring the inclusion on certain court documents of the minor's name and Social Security number fail to guarantee that minor constitutionally adequate anonymity in seeking judicial waiver by not requiring that the juvenile court record be sealed.

The Court also feels that the proceedings in this case should be stayed pending the outcome in the Supreme Court of *Zbaraz v. Hartigan*, 763 F.2d 1532 (7th Cir.1985), *juris. postponed in part*, — U.S. —, 107 S.Ct. 267, 93 L.Ed.2d 245 (1986), *arg. deferred*, — U.S. —, 107 S.Ct. 1600, 94 L.Ed.2d 787 (1987). That case raises two issues, one of which is crucial to a final disposition of this matter. In *Zbaraz*, the court will consider the question of whether the Illinois judicial alternative to parental notification provides sufficient framework for ensuring confidential and expedited appeal. 55 U.S.L.W. 3070 (August 5, 1986) (questions presented for review).

In three other states, notice laws have been enjoined and further judicial proceedings stayed pending the outcome of *Zbaraz*. *Glick v. McKay*, C.A. No. 85–2335 (9th Cir. March 9, 1987); *Eubanks v. Collins*, No. C82–0360L (W.D.Ky. June 9, 1987) [Available on WESTLAW, DCT database]; *Barnes v. Mississippi*, No. J. 86–0458W (S.D.Miss. May 13, 1987). The Court STAYS these proceedings pending the outcome in the Supreme Court of *Zbaraz v. Hartigan*.

## APPENDIX I

SENATE BILL 229

By: Senators Allgood of the 22nd, Kennedy of the 4th and Barnes of the 33rd

### AS PASSED

### AN ACT

To amend Chapter 11 of Title 15 of the Official Code of Georgia Annotated, relating to juvenile court proceedings, so as to grant juvenile courts jurisdiction over proceedings concerning notice to a parent or guardian relative to an unemancipated minor's decision to seek an abortion; to provide for a short title; to provide for definitions; to provide for certain affidavits from a parent or guardian accompanying a minor seeking an abortion; to provide for affidavits from an unemancipated minor and accompanying adult relative to parental notification of an unemancipated minor's decision to seek an abortion; to provide for notice to persons standing in loco parentis; to provide requirements of such affidavits; to provide for the signing of consent forms; to provide procedures for obtaining a waiver from the juvenile court of the requirement for prior parental notification; to provide for venue; to provide for notice to the unemancipated minor or next friend; to provide for waiver of notice under certain conditions; to provide for appellate review; to provide for applicability; to provide for exceptions based upon medical emergency; to provide that the physician performing the abortion as a medical emergency shall certify in writing the medical indications on which he based his judgment; to provide for civil and criminal immunities; to provide for penalties; to provide for other matters related to the foregoing; to repeal conflicting laws; and for other purposes.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

*Section 1.* Chapter 11 of Title 15 of the Official Code of Georgia Annotated, relating to juvenile court proceedings, is amended by striking "or" immediately following subparagraph (a)(2)(B) of Code Section 15–11–5, relating to jurisdiction of the juvenile court, by striking the period and inserting in its place "; or" immediately following

subparagraph (a)(2)(C), and by adding at the end of paragraph (2) of subsection (a) a new subparagraph, to be designated subparagraph (a)(2)(D), to read as follows:

"(D) Under Article 3 of this chapter, relating to prior notice to a parent or guardian relative to an unemancipated minor's decision to seek an abortion."

*Section 2.* Said chapter is further amended by adding at the end thereof a new article, to be designated Article 3, to read as follows:

## "ARTICLE 3

15–11–110. This article shall be known and may be cited as the 'Parental Notification Act.'

15–11–111. As used in this article, the term:

(1) 'Abortion' means the intentional termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus.

(2) 'Unemancipated minor' means any person under the age of 18 who is not or has not been married or who is under the care, custody, and control of such person's parent or parents, guardian, or the juvenile court of competent jurisdiction.

15–11–112. (a) No physician or other person shall perform an abortion upon an unemancipated minor under the age of 18 years unless:

(1) (A) The minor seeking an abortion is accompanied by a parent or guardian and such parent or guardian shall furnish an affidavit signed by such parent or guardian and such minor attesting that such parent or guardian is the lawful parent or guardian of such minor; or

(B) Both the minor seeking an abortion and an accompanying adult furnish the physician or other person intending to perform an abortion upon such minor an affidavit signed by both such minor and accompanying adult to the effect that a parent or, if the minor is subject to guardianship, the legal guardian of such minor has been notified of the intent of the minor to seek an abortion; or

(C) The minor, if the minor has no parent or legal guardian, and an accompanying adult furnish the physician with an affidavit signed by both the minor and the accompanying adult attesting to the fact that the minor does not have a parent or a legal guardian and that the person standing in loco parentis to the minor has been notified of the intent of the minor to seek an abortion; and

(2) The minor signs a consent form stating that she consents, freely and without coercion, to the abortion.

(b) If the unemancipated minor elects not to comply with the notification requirement of subparagraph (a)(1)(B) or (a)(1)(C) of this Code section or if the parent, legal guardian, or person standing in loco parentis of such minor cannot be located, such minor may petition, on such minor's own behalf or by next friend, the juvenile court in the county in which the minor resides or in which the abortion is to be performed for a waiver of such requirement pursuant to the procedures provided for in Code Section 15–11–114. Venue shall be lawful in either such county, notwithstanding Code Section 15–11–15.

15–11–113. Notwithstanding Code Sections 15–11–24 through 15–11–26, the unemancipated minor or next friend shall be notified of the date, time, and place of the hearing in such proceedings at the time of filing the petition. The hearing shall be held within three days of the date of filing, excluding Saturdays, Sundays, and holidays. The parents or guardian or person standing in loco parentis of the unemancipated minor shall not be served with the petition or with a summons or otherwise notified of the proceeding.

15–11–114. (a) An unemancipated minor may participate in proceedings in the court on such minor's own behalf and the court shall advise such minor of the right to court appointed counsel and shall provide such minor with such counsel upon request or if such minor is not already adequately represented.

(b) All court proceedings under this Code section shall be conducted in a manner to preserve the anonymity of the parties and shall be given such precedence over other pending matters as is necessary to ensure

that a decision is reached by the court as expeditiously as is possible under the circumstances of the case.

(c) The notification requirement of subparagraph (a)(1)(B) or (a)(1)(c) of Code Section 15–11–112 shall be waived if the court finds either:

(1) That the unemancipated minor is mature and well-informed enough to make intelligently the abortion decision on her own; or

(2) That the notice to a parent or, if the minor is subject to guardianship, the legal guardian or person standing in loco parentis pursuant to Code Section 15–11–112 would not be in the best interests of the minor.

(d) A court that conducts proceedings under this Code section shall issue written and specific factual findings and legal conclusions supporting its decision and shall order that a record of the evidence be maintained. Such record shall preserve the anonymity of the parties.

(e) An expedited appeal preserving the anonymity of the parties shall be available to any unemancipated minor to whom the court denies a waiver of notice. The appellate courts are authorized and requested to issue promptly such rules as are necessary to preserve anonymity and to ensure the expeditious disposition of procedures provided by this Code section.

(f) No filing fees shall be required of any unemancipated minor who uses the procedures provided by this Code section.

15–11–115. The requirements and procedures of this article shall apply to all unemancipated minors within this state whether or not such persons are residents of this state.

15–11–116. This article shall not apply when, in the best clinical judgment of the attending physician on the facts of the case before him, a medical emergency exists that so complicates the condition of the minor as to require an immediate abortion. A person who performs an abortion as a medical emergency under the provisions of this Code section shall certify in writing the medical indications on which this judg-ment was based when filing such reports as are required by law.

15–11–117. Any physician or any person employed or connected with a physician, hospital, or health care facility performing abortions who acts in good faith shall be justified in relying on the representations of the unemancipated minor or of any accompanying adult purporting to give an affidavit required under this article, including but not limited to, his or her identity, age, marital status, emancipation, and relationship to any person for whom an affidavit is purportedly given. No physician or other person who furnishes professional services related to an act authorized or required by this article and who relies upon the affidavit required and furnished pursuant to this article shall be held to have violated any criminal law or to be civilly liable for such reliance, provided that the physician or other person acted in good faith.

15–11–118. Any person who violates the provisions of this article shall be guilty of a misdemeanor."

*Section 3.* All laws and parts of laws in conflict with this Act are repealed.

## APPENDIX II

### Supreme Court of Georgia

#### June 29, 1987

It is ordered that the Uniform Juvenile Court Rules be amended effective July 1, 1987, by adding a new Rule 23 which shall read as follows:

**SECTION 23: PARENTAL NOTIFICATION OF ABORTION**

**Rule 23.1 STYLE OF THE CASE.** The petition and all other documents in a proceeding under Article 3, Chapter 11, Title 15 of the Official Code of Georgia shall be as provided for in Rule 6.4 relating to cases under appeal.

**Rule 23.2 APPOINTMENT OF GUARDIAN AD LITEM.** Whenever a minor petitions the court for relief under Article 3, Chapter 11, Title 15 of the Official Code of Georgia, the court shall appoint a guardian

ad litem to protect the interests of the minor.

**Rule 23.3   RELATION TO OTHER UNIFORM RULES.**   All rules in conflict with the provisions of Article 3, Chapter 11, Title 15 of the Official Code of Georgia are subrogated to the provisions of that article for the purpose of implementing the intent of the article.

**Rule 23.4   HEARING CONDUCTED BY JUDGE.**   In order to insure the expeditious disposition of the procedures, the hearing provided for in O.C.G.A. § 15–11–113 shall be conducted by a judge in all instances.

**Rule 23.5   NOTIFICATION OF HEARING.**   The minor or next friend shall be notified of the date, time, and place of the hearing in proceedings under this article at the time of the filing of the petition.   The hearing shall be held within three days of the date of filing, excluding Saturdays, Sundays, and holidays.   Upon filing the petition, the clerk shall provide a copy thereof to the minor with the date, time, and place of the hearing recorded thereon.

**Rule 23.6   COURT ORDER.**   Upon conclusion of the hearing to be held pursuant to O.C.G.A. § 15–11–113, the court shall issue a written order stating specific factual findings and legal conclusions supporting its decision.   The order shall be styled in the same manner as the petition and shall reflect the minor's social security number and date of birth.   A certified copy of the order shall be furnished to the minor within 24 hours of the conclusion of the hearing.

**Rule 23.7   RECORD AND TRANSCRIPT.**   The name of the minor shall not appear in any public record, including the transcript of the hearing provided for in Rule 23.4.   Should reference be made to the minor, the clerk shall obliterate or render illegible the name and substitute initials.

**SUPREME COURT OF THE STATE OF GEORGIA,**

CLERK'S OFFICE, ATLANTA

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.

Witness my signature and the seal of said court hereto affixed the day and year last above written.

(s) Joline B. Williams Clerk.

APPENDIX III

**Court of Appeals of the State of Georgia**

July 8, 1987

It is hereby ordered that the Rules for the Court of Appeals of Georgia be and the same hereby are amended by the addition of a new Rule 51 providing for expedited appeals under the Parental Notification Act, a copy of which Rule is attached hereto, marked Exhibit "A" and made a part hereof by reference.   This Rule is effective as of the date of this order.

**Court of Appeals of the State of Georgia**

Clerk's Office, Atlanta

July 8, 1987

I certify that the above is a true extract from the minutes of the Court of Appeals of Georgia.

Witness my signature and the seal of said court hereto affixed the day and year last above written.

(s) Victoria McLaughlin Clerk.

EXHIBIT A

XXIII EXPEDITED APPEALS UNDER THE PARENTAL NOTIFICATION ACT

Rule 51.   (a) This rule is adopted under the authority of Ga. Const. Art. VI, § 1, ¶ 4 (1983), OCGA §§ 15–1–5 and 15–11–114(c) to provide for the expedited consideration of appeals under the "Parental Notification Act."   (OCGA §§ 15–11–110 et seq.)

(b) Any minor to whom a Juvenile Court has denied a waiver of notice under OCGA § 15–11–114(c) may obtain an expedited appeal to this Court.   For the purpose of this Rule, in computing time, Saturdays, Sundays and holidays shall be included.   Rule 3 shall govern in the event an expiration date falls on such a date.

**998**

(c) A minor seeking an expedited appeal shall file a Notice of Appeal and a certified copy of the order denying waiver of notice with the Clerk of this Court. A copy of the Notice of Appeal must also be filed with the Juvenile Court. The name, address and telephone number of the Guardian Ad Litem and any Counsel of Record must be included with the Notice of Appeal. Upon receipt of the Notice of Appeal, this Court will issue an order to the Juvenile Court directing that the record be transmitted to and received by this Court within five (5) days from the date of filing of the Notice of Appeal with this Court. An enumeration of errors shall be filed within the time period for the filing of the record. If a brief is desired, it shall also be filed within the time period for the filing of the record. No filing fee is required.

(d) The record of the Juvenile Court shall be certified by the Clerk of the Juvenile Court and transmitted to this Court under seal.

(e) The Clerk shall assign the appeal to a panel of this Court, who shall take the matter under consideration and shall issue its decision within five (5) days of receipt of the record.

(f) In order to expedite further appellate review, a motion for rehearing shall not be required. However, if the decision of this Court affirms the judgment of the Juvenile Court, the minor may file a motion for rehearing and the same will be governed by Rule 48, except that such a motion shall be filed within five (5) days from the date of the decision of this Court and may be filed out of term. Any motion for rehearing will be decided by the Court within five (5) days of filing thereof.

(g) If the decision of this Court reverses the judgment of the Juvenile Court, the remittitur will be forwarded to the Clerk of the Juvenile Court immediately after the rendition of the decision. If the decision of this Court affirms the judgment of the Juvenile Court, the remittitur shall be transmitted to the clerk of the Juvenile Court as soon as practicable after the expiration of five (5) days from the date of the judgment unless otherwise ordered or un-

less a motion for rehearing or notice of intention to apply to the Supreme Court for writ of certiorari has been filed.

(h) Upon good cause shown, the Court will enter such orders as will further expedite the processing of these cases.

(i) In order to invoke the foregoing special procedures, the Notice of Appeal must be filed within five (5) days of receipt by the minor of the Juvenile Court's order.

(j) All pleadings, briefs, orders, transcripts, exhibits and any other written or recorded material that are part of the record shall be considered and treated by the Court as confidential. Upon conclusion of the appellate proceedings the record will be sealed, and the contents of the record shall not be disclosed, except upon order of this Court or the Supreme Court of Georgia.

This Rule shall become effective immediately.